# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                                    No. CR 16-3648 JB

BRAULIO JAVIER LUEVANO-SANCHEZ,

     Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Braulio Javier Luevano-Sanchez'

Sentencing Memorandum, filed December 2, 2016 (Doc. 34).   The Court held sentencing

hearings on November 7, 2016 and January 3, 2017.  The primary issue is whether a sentence of

24 months -- at the high end of the applicable guideline range -- is greater than necessary to

comply with 18 U.S.C. § 3553(a)'s statutory directives, when Defendant Luevano-Sanchez has

been convicted four times for transporting illegal aliens, illegal reentry, and drug-trafficking; has

been previously deported twice; and has returned to the United States of America after serving a

sentence of 37 months in prison for illegal reentry.   The Court concludes that a Guidelines

sentence of 24 months is not greater than necessary to comply with § 3553(a)'s directives.

Accordingly, the Court (i) denies Luevano-Sanchez' requests that he be sentenced to a term of

imprisonment within the range of 12 months and 1 day to 18 months, or at or below the low-end

of the Guidelines range of 18 to 24 months; and (ii) imposes a sentence at the high end of the

guideline range: 24 months.

## FACTUAL BACKGROUND

The Court takes its facts from the Presentence Investigation Report (disclosed September 28, 2016)(Doc. 20)("PSR").[1]  Luevano-Sanchez was born in Ojo Caliente, Zacatecas, Mexico to Maria del Pilar Sanchez-Colchal, who is deceased, and Filemon Luevano-Garcia, also deceased. See PSR ¶ 31, at 7.  Luevano-Sanchez was previously married to Maria Aracely Flores, but they are now divorced.  See PSR ¶ 34, at 8.  His relationship with Maria produced two children, Braulio Pave Luevano Flores and Ingrid Pamela Luevano Flores, both of whom were born in the United States and reside in Santa Fe, New Mexico, with their mother.  See PSR ¶ 34, at 8.  He has a third child, Eduardo Luevano-Mayorga, who lives with the child's mother, Selena Josefina Mayorga, in Chicago, Illinois.  See PSR ¶ 34, at 8.  Luevano-Sanchez has nine siblings, all of whom he reported as residing throughout Mexico and the United States.[2]  See PSR ¶ 31, at 7.  Luevano-Sanchez reports nine years of formal education in Mexico.  See PSR ¶ 38, at 8.  His usual occupation is sous chef and construction worker.  See PSR ¶ 39, at 8.

Luevano-Sanchez "first moved to the United States in 1991," and has "primarily resided in Santa Fe, New Mexico."  PSR ¶ 33, at 8.  Since his first entry into the United States, Luevano-Sanchez has been convicted four times, including this conviction, and arrested one additional time.  See PSR ¶¶ 22-29, at 5-7.  First, on November 30, 1995, United States border patrol agents

---

[1]The United States Probation Office ("USPO") disclosed the PSR on September 28, 2016, based on the Fast Track Plea Agreement between Luevano-Sanchez and the United States. See Fast Track Plea Agreement, filed September 8, 2016 (Doc. 18)("Fast Track Plea Agreement").  Regarding the factual information in the PSR, Luevano-Sanchez waived the presentence interview and provided the information with the assistance of defense counsel.  See PSR ¶ 30, at 7.  The PSR states that in addition to the information provided by Luevano-Sanchez, it obtained additional information "from Immigration and Customs Enforcement (ICE) records and a 2010 PSR prepared for the District of New Mexico."  PSR ¶ 30, at 7.

[2]The PSR cites Luevano-Sanchez' 2010 PSR for the information regarding his siblings' respective countries of domicile.  PSR ¶ 31, at 7.  The Court did not review the 2010 PSR, which is presumably related to his illegal re-entry conviction in 2010.

arrested Luevano-Sanchez near Deming, New Mexico, for transporting illegal aliens.  See PSR ¶ 22, at 5.  Regarding his 1995 arrest, the PSR states that Luevano-Sanchez was driving his vehicle, heading "north on highway 180 onto highway 26, which agents knew as a notorious route for the smuggling of illegal aliens and narcotics," and upon stopping and searching his vehicle, the officers discovered "four individuals in the front cab and six additional individuals . . . hidden in the camper shell of the truck."  PSR ¶ 22, at 5.  Upon questioning, "all ten individuals admitted to being in the United States illegally," and Luevano-Sanchez likewise informed the officers that he "entered the United States illegally on November 27, 1995, near Columbus, New Mexico."  PSR ¶ 22, at 5.  He informed the officers, furthermore, that he "knew the individuals inside the truck were illegal aliens and were headed to Santa Fe, New Mexico." PSR ¶ 22, at 5.  On March 15, 1996, the Honorable Martha Vazquez, United States District Judge for the United States District Court for the District of New Mexico, sentenced him to 109 days of incarceration, and, subsequently, on March 27, 1996, he was deported.  See PSR ¶ 22, at 5.

Second, on March 16, 2010, Luevano-Sanchez was convicted of illegal re-entry into the United States subsequent to removal and sentenced to 37 months incarceration with a 3-year term of supervised release.  See PSR ¶ 23, at 5-6.  Regarding this second conviction, the PSR states that, on July 17, 2009, United States Immigration and Customs Enforcement agents "encountered the defendant, at the Santa Fe Adult Detention Center," where he was "in custody for pending drug trafficking charges."  PSR ¶ 23, at 6.  The drug-trafficking charges stemmed from Luevano-Sanchez' involvement in the sale of one kilogram of cocaine on June 22, 2009, which "undercover police officers, posing as cocaine dealers from Texas" had facilitated.  PSR ¶ 23, at 5-6.  He informed the officers after his arrest that "he was being paid $500 for

assisting the sale of the cocaine." PSR ¶ 23, at 6. Luevano-Sanchez "pled guilty to the re-entry charge and the drug charges were dismissed as part of the plea agreement." PSR ¶ 23, at 6. On February 29, 2012, he was deported to Mexico after completing the 37-month sentence that the Honorable William P. Johnson, United States District Judge for the District of New Mexico, gave him. See PSR ¶ 23, at 6.

Third, on March 24, 2014, the Santa Fe Police Department of Santa Fe, New Mexico arrested Luevano-Sanchez on charges of driving without a license and concealing his identity. See PSR ¶ 29, at 7. Concerning this arrest, the PSR states:

> The defendant claimed he had no identification on him and provided a name. No records came up under this name. Officers noticed what appeared to be a wallet in the defendant's pocket and asked to see it. Inside the wallet, the defendant [had] a Mexican ID card with his photo and the name Roberto Luevano. The defendant was arrested under this name.

PSR ¶ 29, at 7. The PSR states that the final disposition of those charges is unknown. See PSR ¶ 29, at 7.

Fourth, on October 27, 2015, Luevano-Sanchez, as court records indicate,[3] was arrested on one felony drug-trafficking charge. See PSR ¶ 24 at 6. Luevano-Sanchez was arrested after having "sold cocaine on multiple occasions from April 30, 2015, to October 27, 2015." PSR ¶ 24 at 6. Consequently, on August 9, 2016, the First Judicial District Court, Court of Santa Fe, State of New Mexico sentenced him to nine years in custody with nine years suspended and five years of probation. See PSR ¶ 24 at 6.

The PSR explains that the current offense occurred during this period of incarceration:

> On November 10, 2015, United States Immigration and Customs Enforcement (ICE) agents were contacted by the Santa Fe County District Attorney's office in regards to the defendant. The defendant was arrested on October 27, 2015, for

---

[3]Regarding this arrest, the PSR states that offense reports were requested but have not been received. See PSR ¶ 24 at 6.

state charges stemming from cocaine trafficking. ICE deportation officers initiated an investigation and determined the defendant was previously deported to Mexico on February 29, 2012, [] which was subsequent to a conviction for an aggravated felony for Transporting Illegal Aliens, in United States District Court, District of New Mexico, in Albuquerque, case number 2:95CR00650. A federal warrant was issued and an ICE detainer was sent to the Santa Fe County Adult Detention Center.

PSR ¶ 5, at 3.

## PROCEDURAL BACKGROUND

On September 8, 2016, Plaintiff United States of America filed an Information in the United States District Court for the District of New Mexico charging Luevano-Sanchez with Re-entry of a Removed Alien in violation of 8 U.S.C. § 1326(a) and (b). See Information at 1, filed September 8, 2016 (Doc. 15). The Information alleges that Luevano-Sanchez reentered the United States "while an Order of Exclusion, Deportation, and Removal was outstanding." Information at 1. On September 8, 2016, he pled guilty, pursuant to the Fast Track Plea Agreement, see Fast Track Plea Agreement, filed September 8, 2016 (Doc. 18), to the one-count Information, before the Honorable Karen B. Molzen, Magistrate Judge for the District of New Mexico, see Plea Minute Sheet at 1, filed September 8, 2016 (Doc. 19).

The Court will discuss the procedural background in six sections. First, it will describe the PSR's Guidelines sentencing calculations and Luevano-Sanchez' amended plea agreement. Second, the Court will discuss its handwritten revisions to the PSR. Third, the Court will discuss the amended-plea hearing, where the Court rejected the amended plea agreement. Fourth, the Court will discuss Luevano-Sanchez' guilty plea. Fifth, the Court will discuss Luevano-Sanchez' Sentencing Memorandum. See Sentencing Memorandum, filed December 2, 2016 (Doc. 34)("Sentencing Memorandum"). Sixth, the court will discuss the sentencing hearing.

1.    __The PSR and the Amended Plea Agreement__.

The United States Probation Office ("USPO") disclosed the PSR on September 28, 2016. See PSR at 1.  The PSR states that Luevano-Sanchez's base offense level is 8, and it assesses a 16-level enhancement pursuant to U.S.S.G. § 2L1.2(b)(1)(A)(2015 version),[4] because he "was previously deported following an aggravated felony conviction for Transporting Illegal Aliens." PSR ¶ 9-11, at 4.  It makes a 2-level reduction under U.S.S.G. § 3E1.1(a) for acceptance of responsibility, and an additional 1-level reduction under U.S.S.G. §3E1.1(b) for assisting in the investigation or prosecution of the underlying offense by notifying authorities of the intention to enter a plea of guilty.  See PSR ¶¶ 17-18, at 4.  It reduces the total offense level of 21 by 4 additional levels for a fast-track benefit pursuant to U.S.S.G. § 5K3.1, resulting in a total offense level of 17.  See PSR § 19, at 4. The PSR states: "The 2015 Guidelines Manual, incorporating all guideline amendments, was used to determine the defendant's offense level. USSG § 1B1.11." PSR ¶ 9, at 4.

Luevano-Sanchez's past convictions result in 4 criminal history points, corresponding to a criminal history category of III.  See PSR ¶¶ 22-26, at 5-7.  The PSR states that, based upon a

---

[4]On November 1, 2016, the United States Sentencing Guidelines promulgated Amendment 802, which altered U.S.S.G. §§ 2L1.1 and 2L1.2.  See U.S.S.G. app. C, supp. (U.S. Sentencing Comm'n 2016).  Before the November 1, 2016 amendment, § 2L1.2(b)(1)(A) instructed sentencing courts to increase a defendant's base offense level by 16 levels

> if the defendant previously was deported, or unlawfully remained in the United States, after a conviction for a felony that is (i) a drug trafficking offense for which the sentence imposed exceeded 13 months; (ii) a crime of violence; (iii) a firearms offense; (iv) a child pornography offense; (v) a national security or terrorism offense; (vi) a human trafficking offense; or (vii) an alien smuggling offense.

U.S.S.G. app. C, supp. (U.S. Sentencing Comm'n 2016).  Pursuant to the 2015 version of § 2L1.2(b)(1)(A), the PSR applies a 16-level enhancement, because Luevano-Sanchez was previously deported following his felony conviction in 1995 for transporting illegal aliens, which is an alien smuggling offense.  See PSR § 11, at 4.

total offense level of 17 and a criminal history category of III, the applicable guideline

imprisonment range is 30 to 37 months.  See PSR ¶ 44, at 9.  Regarding the impact of the plea

agreement, the PSR states that the "plea is binding pursuant to Rule 11(c)(1)(C) of the Federal

Rules of with the Early Disposition Program under U.S.S.G. § 5K3.1."  PSR ¶ 45, at 9.  It further

states:

> If [Luevano-Sanchez] were convicted at trial of all Counts of the Information, his
> statutory penalties would be unchanged.  If he were convicted at trial, his offense
> level would have been 24.  An offense level of 24 combined with a criminal
> history category of III results in a guideline imprisonment range of 63 months to
> 78 months.  The defendant reduced his exposure to incarceration by entering into
> the plea agreement.

PSR ¶ 46, at 9.  The PSR explains that, while the "Court may impose a term of supervised

release of not more than three years," under 18 U.S.C. § 3583(b)(2), the court "ordinarily should

not impose a term of supervised release in a case in which supervised release is not required by

statute and the defendant is a deportable alien who likely will be deported after imprisonment"

pursuant to U.S.S.G. § 5D1(c).  PSR ¶ 49, at 9.  Additionally, the PSR states that Luevano-

Sanchez is "eligible for not less than one nor more than five years probation because the offense

is a Class C Felony," under 18 U.S.C. § 3561(c)(1), but, because of "the applicable guideline

range is in Zone D of the Sentencing Table, the defendant is ineligible for probation," under

U.S.S.G. § 5B1.1 n.2.  PSR ¶ 51, at 10.

In identifying factors that would warrant a departure from the advisory guideline range,

the PSR explains that, "[p]ursuant to U.S.S.G. § 5K3.1 and the early disposition program

authorized by the Attorney General and the United States Attorney, the government agrees to

move, at the time of sentencing, for a departure of four additional levels from the total offense

level as calculated under the sentencing Guidelines."  PSR ¶ 60, at 10.  Additionally, the PSR

explains that, "after reviewing the proposed amendment to U.S.S.G. § 2L1.2, it was determined

the defendant would benefit from the amendment[5] when it is anticipated to go into effect on November 1, 2016." PSR ¶ 61, at 11. The PSR explains that, by applying the relevant changes of proposed amendment to U.S.S.G. § 2L1.2, and with "a four-level downward departure under U.S.S.G. § 5K3.1, the total offense level would be 9 which when combined with a criminal history category of III, would result in a guideline imprisonment range is 8 to 14 months." PSR ¶ 61, at 11.

The PSR notes that the United States would not oppose Luevano-Sanchez' withdrawal from the plea agreement to benefit from the proposed amendment to the Guidelines. See PSR ¶ 62, at 11. In the case of his withdrawal, the PSR proposes that the United States could offer him, in its sole discretion, an amended plea agreement that stipulates an appropriate sentence within the revised guideline imprisonment range of 8 to 14 months. See PSR ¶ 62, at 11. It explains that the new agreement would "take into account the defendant's acceptance of responsibility, the proposed amendment to § 2L1.2, and the four-level downward departure under § 5K3.1, with no further reduction to occur." PSR ¶ 62, at 11. Finally, the PSR states that it has not identified any information "concerning the offense or the defendant which would warrant a variance from the advisory guideline range." PSR ¶ 63, at 11.

Luevano-Sanchez maintained his plea of guilty, and on October 13, 2016, he pled guilty before the Honorable Steven C. Yarbrough, Magistrate Judge for the District of New Mexico, to a new plea agreement's terms. See Plea Minute Sheet at 1, filed October 13, 2016 (Doc. 28). The Amended Plea Agreement is essentially identical to the Fast Track Plea Agreement, and the

---

[5]In accordance with the changes in Amendment 802, U.S.S.G. § 2L1.2 now instructs sentencing courts to consider the length of an illegal reentrant's prior sentences rather than the nature of the crimes committed. See U.S.S.G. app. C, supp. (U.S. Sentencing Comm'n 2016). The amendment's effect upon Luevano-Sanchez' sentencing calculation is, essentially, that the 16-level enhancement under Specific Offense Characteristics becomes an 8-level enhancement, as fully explained below.

only material change is the Amended Plea Agreement's adoption of the proposed amendment to U.S.S.G. § 2L1.2.[6]  See Amended Plea Agreement, filed October 13, 2016 (Doc 27)("Amended Plea Agreement").     The Amended Plea Agreement stipulates a guidelines sentence corresponding to a criminal history category of III and total offense level of 9, which "takes into account the defendant's acceptance of responsibility, the proposed November 1, 2016, amendments to USSG § 2L1.2, and the applicable downward departure pursuant to § 5K3.1." Amended Plea Agreement at 4.  It further stipulates that Luevano-Sanchez will not seek "any further reduction, departure, deviation, or variance through motion or by argument at sentencing pursuant to 18 U.S.C. § 3553(a), United States v. Booker, 543 U.S. 220 (2005), or otherwise." Amended Plea Agreement at 5.  On October 27, 2016, Luevano-Sanchez filed a motion to continue the sentencing hearing, which the United States did not oppose.  See Unopposed Motion to Continue Sentencing Hearing (filed October 28, 2016)(Doc. 30)("Motion to Continue").  Luevano-Sanchez presumably sought to take advantage of the decreased total offense level benefit of the proposed amendment to § 2L1.2.  See Motion to Continue at 1.  The Court granted an order continuing the sentencing hearing, rescheduling the hearing on November

---

[6]The Fast Track Plea Agreement stipulated the following in regard to the proposed amendment:

> If, after a Presentence Report is prepared, the parties agree that the proposed November 1, 2016, Sentencing Guideline Amendments to USSG § 2L1.2 would result in a lower adjusted offense level, the United States will not oppose Defendant's withdrawal from this plea agreement.  If Defendant withdraws from this plea agreement for the reason set forth in the preceding sentence, the United States may, in its sole discretion, offer Defendant an amended Rule 11(c)(1)(C) plea agreement in conformity with the proposed November 1, 2016, Sentencing Guideline Amendments to USSG § 2L1.2.

Fast Track Plea Agreement at 5-6.

7, 2016, six days after the amendment went into effect.  See Order Continuing Sentencing

Hearing, filed November 2, 2016 (Doc. 30).

2.    **The Court's Revisions to the PSR.**

On October 27, 2016, the Court revised the PSR, making three discrete, handwritten

changes to the PSR's offense level calculations.  See PSR ¶¶ 11-19, at 4.  First, the Court

reduced the 16-level enhancement under the Specific Offense Characteristics to an 8-level

enhancement in accordance with the proposed amendment to U.S.S.G. § 2L1.2, and in

anticipation of its promulgation on November 1, 2016.  See PSR ¶ 11, at 4.  The Court

determined that an 8-level enhancement is appropriate under amended § 2L1.2(b), which

increases Luevano-Sanchez' offense level by 4-levels, because of his prior illegal entry offense,

and an additional 4 levels, because of his 2015 drug-trafficking conviction.  See U.S.S.G.

§ 2L1.2(b)(1)(A) and (3)(D).[7]  Second, it changed the Adjusted Offense Level accordingly, from

24 to 16, to reflect the adjustment to the Specific Offense Characteristic.  See PSR ¶ 15, at 4.

Third, the Court changed the total offense level from 17 to 13.  See PSR ¶ 19, at 4.  The change

to the total offense level factors in the revised enhancement level under Specific Offense

Characteristics, the original reduction of 2 levels under U.S.S.G. § 3E1.1(a), and the original

reduction of 1 level under U.S.S.G. § 3E1.1(b), but it omits the additional 4-level fast-track

---

[7]U.S.S.G. § 2L1.2(b)(1)(A) instructs sentencing courts to increase the base offense level by 4 levels if the defendant has "committed the instant offense after sustaining a conviction for a felony that is an illegal re-entry offense," and  § 2L1.2(3)(D) instructs sentencing courts to increase the base offense level by 4 levels if the defendant has a "conviction for any other felony offense (other than an illegal re-entry offense)" subsequent to being deported or removed. U.S.S.G. § 2L1.2(b)(1)(A) and (3)(D).

reduction under § 5K3.1 included in the PSR's original calculation of the total offense level.[8] See PSR ¶ 19, at 4.

    **3.**     **The Amended Plea Agreement Hearing and the Court's Rejection of the Amended Plea Agreement.**

The Court then held a hearing on November 7, 2016. See Transcript of Hearing (taken November 7, 2016)("2016 Tr.").[9] Luevano-Sanchez first confirmed with the Court that he had no objections to the PSR's factual allegations. See 2016 Tr. at 2:7-11 (Court, Keefe). The Court and the parties then addressed the revisions made to the PSR and the recommended sentence set forth in the Amended Plea Agreement. See 2016 Tr. at 2:3-5:18 (Court, Keefe, Probation Officer, Walsh). In the Amended Plea Agreement, the United States agreed to a total offense level of 9 and criminal history category calculation of III, resulting in a recommended guideline imprisonment range of 8 to 14 months. See 2016 Tr. at 3:14-4:6 (Court, Keefe, Probation Officer); Amended Plea Agreement at 4. The Court, however, observed that the Amended Plea Agreement retained the additional 4-level fast-track downward departure that the Court rejected when it revised the PSR. See 2016 Tr. at 4:23-5:5 (Court, Keefe); Amended Plea Agreement at 4. The Court observed that, without the 4-level fast-track downward departure that it had previously rejected, the advisory guideline range is 18 to 24 months, based on a total offense level of 13 and criminal history category of III. See 2016 Tr. at 5:23-5:5 (Court, Keefe). The Court and the parties had the following exchange:

> THE COURT: And the 4 additional is what you mean by the variance that the . . .

---

[8]If the Court, in its revision of the PSR, had factored in the additional 4-level reduction under § 5K3.1, the total offense level would be 9.

[9]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions. Any final transcripts may contain slightly different page and/or line numbers.

MR. KEEFE: That the fast track would have afforded.

THE COURT: But now you have a Rule 11c[(1)(C)] at [9]. So a 13 and a [III] would be 18 to 24 would be the current range?

[MR. KEEFE]: [O]nly with acceptance, I guess yes, Your Honor, correct.

THE COURT: All right.  [United States Probation Officer] Ms. C De Baca what's your thoughts on that[?]  Do you agree[?]

PROBATION OFFICER: That's correct, Your Honor.

THE COURT: And you agree with that being the current range the current guideline range Mr. Walsh?

MR. WALSH: I do.

THE COURT: Okay. All right so the offense level is 13 and the criminal history category is [III], establishing a guideline imprisonment range of 18 to 24 months. And then the one that's proposed would give me a guideline range of 8 to 14 months . . .

2016 Tr. at 4:23-5:18 (Court, Keefe, Probation Officer, Walsh).

The Court then reviewed Luevano-Sanchez's previous criminal offenses -- the first for transporting illegal aliens in 1996 and the second for illegal re-entry in 2009.  See 2016 Tr. at 6:19-22 (Court).  The Court stated that, in light of these convictions, the Court could understand why Luevano-Sanchez had waited past November 1, 2016, "to take advantage of the new Guidelines."  2016 Tr. at 5:23-24 (Court).  Nevertheless, the Court expressed concern that the proposed imprisonment range of 8 to 14 months was inadequate to sentence Luevano-Sanchez in light of the prior convictions.  See 2016 Tr. at 5:25-6:2 (Court).  It observed that it was inclined to reject the plea agreement, because it would not be appropriate given the two convictions in addition to two prior deportations.  See 2016 Tr. at 6:6-12 (Court).

Luevano-Sanchez argued that the Court should take account of certain circumstances of the sentences that he served for his prior convictions.  See 2016 Tr. at 6:16-7:22 (Court, Keefe).

First, he argued that the 37-month sentence he served for the illegal re-entry offense was a "relatively high sentence for a first re-entry." 2016 Tr. at 6:18-19 (Keefe). Second, he asserted that the 109-day sentence he served for the transporting illegal aliens offense reflected, in part, the fact that his "attorney at that time was able to successfully argue that it was basically a group of people traveling together, and at the time they were stopped it just happened that it had been Mr. Luevano-Sanchez [who] turn[ed out] to be the driver." 2016 Tr. at 7:10-14 (Keefe). The Court, unpersuaded by Luevano-Sanchez' arguments, stated that it was not inclined to grant the departure. See 2016 Tr. at 8:2-3 (Court). The Court noted that the Luevano-Sanchez's 37-month term of incarceration for illegal re-entry possibly reflected the fact that "Judge Johnson . . . what troubled him was that he had a transporting illegal aliens [conviction] earlier." 2016 Tr. at 6:23-7:2 (Court). The Court observed that Luevano-Sanchez's 2009 drug-trafficking charges were dismissed as part of his plea agreement for the illegal re-entry charge in 2009. See 2016 Tr. at 7:18-19 (Court). The Court also noted that Luevano-Sanchez now has "another trafficking conviction up in Santa Fe." 2016 Tr. at 7:23-24 (Court).

Luevano-Sanchez then urged the Court to examine circumstances beyond his criminal history. See 2016 Tr. at 8:8-9 (Keefe). He explained:

> He has spent more than half of his life in New Mexico, lived in Santa Fe for about 26 years. At one point [he] had an employer trying to help him out in terms of offering to adopt him when he was much younger in order to try to help him establish residency. He has a family here, has children who are United States citizens. He has in the recent past lost both of his parents. His mother actually passed away approximately 6 months ago while he was in custody on the present charges. He's been in custody since November of last year for almost an entire year. And Your Honor he does have family in [Zacatecas], Mexico, he indicates he has 8 siblings still residing in Zacatecas. He does mention that there are serious problems down there in terms of a difficult place to live with the drug cartels still holding strong control of the area, and basically exercising a lot of power in the region in the area where his family resides, it makes it very difficult.

2016 Tr. at 8:10-9:4 (Keefe).  Luevano-Sanchez stated that, nevertheless, he "understands that he's had these prior convictions and that . . . he's very likely to be looking at a lot more time in the future if he were to return [to the United States]."   2016 Tr. at 9:4-8 (Keefe).   He acknowledged that "he needs to go back to Mexico and he's planning on exploring options, to see if possibly his family would consider relocating to Mexico."  2016 Tr. at 9:8-11 (Keefe).  He offered his remorse, stating that he "would like to apologize for returning here" and that "[i]t won't happen again," and he asked the Court to accept the Amended Plea Agreement so that he "can go back to Zacatecas."  2016 Tr. at 10:18-20 (Luevano-Sanchez).  Luevano-Sanchez asked the Court, alternatively, to consider imposing terms of supervised release "as an option in order to give the Court an additional amount of time to hold over [his] head if he should return to the United States in the near future." 2016 Tr. at 9:12-22 (Keefe).  He further argued that "the Government would offer the same sort of a plea based on the new Guidelines, and the fast-track plea agreement . . . [to] anyone else apparently in his situation."  2016 Tr. at 9:24-10:5 (Keefe). Following this rationale, Luevano-Sanchez asked the Court to accept the Amended Plea Agreement and "fashion some sort of sentence that takes into consideration all the concerns of the Court."  2016 Tr. at 10:5-8 (Keefe).

The United States offered several additional arguments in support of Luevano-Sanchez' request that the Court accept the Amended Plea Agreement.  See 2016 Tr. at 10:25-11:2 (Walsh). First, it asserted that, despite that "there is no age limit as we all know as to predicate offenses that warrant an enhancement," Luevano-Sanchez' transporting illegal aliens offense was "over 20 years ago, so that's quite dated."  2016 Tr. at 11:3-7 (Walsh).  The Court responded to this assertion, observing that "he's not picking up any criminal history points for it," and, furthermore, "he was on warning then and he was deported afterwards."  2016 Tr. at 11:9-12

- 14 -

(Court). It further observed that "they probably could have charged him with re-entry just as easily as transporting but it's a similar offense is the reason I bring it up." 2016 Tr. at 11:16-18 (Court). The Court explained:

> [T]he [current version of U.S.S.G. § 2L1.2] give[s] [Luevano-Sanchez] a substantial break, and push[es] it down to a level that I think is probably below what I would sentence him on my own, but nonetheless, I'd probably sentence him within the guideline range but probably toward the top which would be [] substantially less than what Judge Johnson gave him for the same offense in 2010. I realize the landscape has changed, but nonetheless, the factors that I think I would emphasize would be deterrence, specifically specific deterrence and promoting respect for the law which is equivalent [to] about his third immigration offense.

2016 Tr. at 12:24-13:11 (Court)(alterations added). Accordingly, the Court explained that "something at the high end of the range would be appropriate, and I could do, but I don't think I could push it down 14 months, I don't think I can justify that." 2016 Tr. at 13:11-14 (Court).

Second, the United States observed that, while Luevano-Sanchez' 2010 drug-trafficking conviction "is one that gets anyone's attention," he nonetheless did not serve any sentence of imprisonment for the conviction, and, moreover, "the [drug] quantities weren't all that substantial." 2016 Tr. at 11:21-12:2 (Walsh). It stated that, concerning the 37-month sentence for his 2009 illegal re-entry offense, it did not "have any additional information as to the high sentence," but nonetheless conceded that it was "obviously something that should be taken into account." 2016 Tr. at 12:2-11 (Walsh). The United States echoed Luevano-Sanchez' request and ultimately argued that the Court impose a 14-month sentence, in addition to "some supervised release as kind of an extra security blanket as well." 2016 Tr. at 12:11-14 (Walsh). The Court remained similarly unpersuaded, notwithstanding the United States' arguments, and it informed the parties that it would ultimately reject the Amended Plea Agreement. See 2016 Tr. at 13:13-17 (Court).

- 15 -

4.    <u>**Luevano-Sanchez' Guilty Plea**</u>.

After the Court rejected the Amended Plea Agreement, <u>see</u> 2016 Tr. at 13:13-17 (Court), Luevano-Sanchez pled guilty to the current illegal re-entry charge, <u>see</u> Plea Minute Sheet at 1, filed December 1, 2016 (Doc. 35)("Plea Minute Sheet"). On December 1, 2016, Luevano-Sanchez made his plea before the Honorable William P. Lynch, Magistrate Judge for the United States District Court for the District of New Mexico. Plea Minute Sheet at 1. Luevano-Sanchez contends that he pled guilty to the illegal re-entry charge without the benefit of a plea agreement at the hearing. <u>See</u> Sentencing Memorandum at 2.

5.    <u>**Luevano-Sanchez' Sentencing Memorandum**</u>.

Luevano-Sanchez filed his Sentencing Memorandum on December 2, 2016. <u>See</u> Sentencing Memorandum at 4. In his Sentencing Memorandum, Luevano-Sanchez explains that he entered into a Fast Track Plea Agreement on September 8, 2016, and that the PSR indicated that he would benefit from the amendment to the sentencing Guidelines which took effect on November 1, 2016. <u>See</u> Sentencing Memorandum at 1. He explains that, on October 13, 2016, he subsequently entered into a new plea agreement, which recommended an "imprisonment range of 8-14 months." Sentencing Memorandum at 1. He then recalls that the Court rejected the Amended Plea Agreement on November 7, 2016, and that "the Court believed that a sentence at the high end of the sentencing Guidelines without a fast track benefit would be appropriate." Sentencing Memorandum at 1-2. Luevano-Sanchez correctly notes that, without the benefit of the 4-level fast track reduction, he would be facing an offense level of 13, which when combined with a criminal history category of III, results in a Guideline imprisonment range of 18 to 24 months. <u>See</u> Sentencing Memorandum at 2.

Luevano-Sanchez requests in his Sentencing Memorandum that the Court grant him a downward variance, pursuant to 18 U.S.C. § 3553(a), warranted by "his history and

characteristics," which would provide for a sentence between 12 months and 1 day to 18 months. Sentencing Memorandum at 1, 4.  He asserts that the requested sentence range "would be sufficient without being greater than necessary to achieve the purposes of sentencing." Sentencing Memorandum at 4.  He makes this assertion "in spite of having received a 37-month sentence on a prior re-entry conviction from 2010," in addition to the "109-day sentence for the 1996 conviction for transporting illegal aliens" and his drug trafficking conviction in Santa Fe County, New Mexico in 2015.  Sentencing Memorandum at 2.

Luevano-Sanchez devotes much of his argument in the Sentencing Memorandum to describing the circumstances that informed his decision to come initially to the United States and then to subsequently return following his deportation in 2012.  See Sentencing Memorandum at 2-4.  He states that he was the youngest child in his family, and his "family was very close and had great respect for his parents."  Sentencing Memorandum at 4 (alteration added).  Luevano-Sanchez explains that "most of his older siblings left for the United States," and as a result, he "was not allowed to attend school and . . . continue his studies after middle school," because his father "needed his help in taking care of the ranch and cattle."  Sentencing Memorandum at 4. He then states that his older siblings eventually returned to Zacatecas, and "they were given preference . . . in terms of responsibilities on the ranch and within the family."  Sentencing Memorandum at 4.  He explains that he felt "somewhat resentful of his older siblings because he felt put aside by the older members of his family," and, because it "appeared he had limited options in Mexico . . . . [He] traveled to the United States with the woman he ended up marrying."[10]  Sentencing Memorandum at 4.

---

[10]The Court notes that there is an inconsistency in the Sentencing Memorandum with respect to whether Luevano-Sanchez was accompanied by his ex-wife the first time he entered the United States.  See Sentencing Memorandum at 2, 4.  His statement that he entered with "the

Luevano-Sanchez cites employment opportunities as the reason that he originally came to the United States at the age of sixteen.  See Sentencing Memorandum at 2.  According to Luevano-Sanchez, this is the case for "almost all other Mexican Nationals who enter the United States."  Sentencing Memorandum at 2.  Luevano-Sanchez maintains that, since coming to the United States, he has had "an excellent employment history while working as a chef at several restaurants . . . over the many years that he lived in Santa Fe."  Sentencing Memorandum at 2-3.  He explains that he "stayed in the Santa Fe area because he was able to financially provide for himself and his family by remaining employed usually at two different restaurants at the same time."  Sentencing Memorandum at 3.  He asserts that he is "a hard worker and he knows that he will not be able to make the same income working in Mexico."  Sentencing Memorandum at 3.

Additionally, Luevano-Sanchez elaborates on the difficulties he faced in Mexico following his deportation in 2012.  See Sentencing Memorandum at 3.  Luevano-Sanchez states that "his father passed away in February of 2012 and [he] stayed with his mother for a period of time in Zacatecas."  Sentencing Memorandum at 3.  He informs the Court that, in 2012, the state of Zacatecas was "being controlled by the Zeta Drug Cartel[[11]]" and that he was being pressured

---

woman he ended up marrying," Sentencing Memorandum at 4, contradicts his statement, at another point, that he "traveled to this country on his own."  Sentencing Memorandum at 2.  The Court does not, however, regard this inconsistency as materially affecting Luevano-Sanchez' arguments in the Sentencing Memorandum.

[11]The Zeta Drug Cartel, also known as "Los Zetas," is a Mexican criminal syndicate to which the United States has referred as "the most technologically advanced, sophisticated and dangerous cartel operating in Mexico."  Michael Ware, Los Zetas called Mexico's most dangerous drug cartel, CNN (Aug. 6, 2010), http://www.cnn.com/2010/WORLD/americas/08/06/mexico.drug.cartels/index.html?iref=24hours.  Commandos who had deserted the Mexican army formed Los Zetas in the 1990s.  See Ware, supra.  Ralph Reyes, the United States Drug Enforcement Agency's chief for Mexico and Central America has stated: "The Zetas have obviously assumed the role of being the No. 1 organization responsible for the majority of the homicides, the beheadings, the kidnappings, the extortions that take place in Mexico."  Ware, supra.

by the cartel "to assist them with their operations in Zacatecas." Sentencing Memorandum at 3. Luevano-Sanchez states that he "felt threatened by the Zeta Drug Cartel and as a result, [and] at his mother's request, he left Zacatecas." Sentencing Memorandum at 3. He then states that, "[s]hortly after that time, [he] returned to Santa Fe." Sentencing Memorandum at 3.

Finally, Luevano-Sanchez directs the Court to consider his familial ties in the United States. See Sentencing Memorandum at 3-4. He states that he has three children, the oldest of whom resides in Chicago and is a permanent legal resident, while his two younger two children -- a sixteen-year-old son and thirteen-year-old daughter -- were born in the United States, and live with their mother in Santa Fe. Sentencing Memorandum at 3-4. Additionally, Luevano-Sanchez states that their mother was the "woman he ended up marrying" and that they "were together for several years before their divorce." Sentencing Memorandum at 4. Luevano-Sanchez mentions that his mother had a heart attack in Mexico and "passed away in February 2016 while [he] was in custody on the recent trafficking charges." Sentencing Memorandum at 3.

## 6.    **The Sentencing Hearing.**

The Court held a sentencing hearing on January 3, 2017. See Transcript of Hearing (taken January 3, 2017)("2017 Tr."). The United States first moved for a three-level adjustment downward for acceptance of responsibility. See 2017 Tr. at 2:11-17 (Cairns, Court). Luevano-Sanchez agreed with the Court's observation that, in accordance with an offense level of 13 and criminal history category of III, the appropriate Guideline imprisonment range is 18 to 24 months. See 2017 Tr. at 2:22-3:2 (Court, Keefe). Consistent with his request in the Sentencing Memorandum, Luevano-Sanchez requested that the Court impose a sentence within the range of a year and a day to 18 months. See 2017 Tr. at 3:18-21 (Keefe).

Luevano-Sanchez argued that the arguments in the Sentencing Memorandum support a sentence within his requested range of 12 months and 1 day to 18 months, and he then further elaborated on several of those arguments.  See 2017 Tr. at 3:21-6:16 (Keefe, Luevano-Sanchez). Luevano-Sanchez again asked the Court to consider his childhood in Mexico that "in some ways [] left [him] with few options," but conceded that he "originally came to the United States seeking employment."  2017 Tr. at 3:22-4:1 (Keefe)(alterations added).  Luevano-Sanchez explained that he has three children in the United States and intends to provide for them, but he argued that he will not be able to do so if he is "continually locked up [over] and over again in prison."  2017 Tr. at 4:12-5:4 (Keefe)(alteration added).  He informed the Court that he is concerned about his two children in Santa Fe, because they "are doing really badly in school after what happened to [him]" and, specifically, that "the older one is being observed . . . by teachers in the new school because the grades have gone, so, so low."  2017 Tr. at 6:8-13 (Luevano-Sanchez).  Concerning his 2015 drug conviction, he added that he was only "acting as some sort [of] go between . . . to receive $500" and was placed on probation.  2017 Tr. at 4:3-10 (Keefe).  He explained once again that the drug cartel activity in Zacatecas had some influence in his decision to come back.  See 2017 Tr. at 4:15-22 (Keefe).  He again acknowledged responsibility for violating United States immigration laws, understanding that he "really can't afford to come back."  2017 Tr. at 4:25-6:2 (Cairns, Court, Luevano-Sanchez).  Luevano-Sanchez observed that, accordingly, his children will have to go to Mexico to visit him in the future.  See 2017 Tr. at 5:23-24 (Luevano-Sanchez).  The United States then recommended a sentence between 8 and 14 months, stating that it was bound by its contractual agreement in the rejected Amended Plea Agreement.  See 2017 Tr. at 7:17-21 (Cairns).

The Court then imposed the sentence. See 2017 Tr. at 7:24-15:12. It explained that, in reaching its decision, it reviewed the PSR, the sentencing Guidelines, and the factors in 18 U.S.C. § 3553(a)(1)-(7). See 2017 Tr. at 8:2-10 (Court). The Court reiterated once again that, without the fast-track benefit in the rejected Amended Plea Agreement, the offense level is 13 and the criminal history category is III, resulting in a Guideline imprisonment range of 18 to 24 months. See 2017 Tr. at 8:12-14 (Court). It observed that Luevano-Sanchez illegally reentered the United States after having been deported previously, subsequent to an aggravated felony conviction. See 2017 Tr. at 8:14-17 (Court). The Court then explained that, after careful consideration of the Guidelines, the record of the two hearings, and Luevano-Sanchez' history and circumstances, it would sentence Luevano-Sanchez to a term within the Guidelines range. See 2017 Tr. at 8:18-9:4 (Court). The Court noted that the current range is "considerably less than what Judge Johnson sentence[d] him to in 2009," but, nonetheless, is sufficient. 2017 Tr. at 9:17-20 (Court).

The Court explained that the current Guidelines properly reflect the § 3553(a) factors, whereas the lower range that it rejected at the previous hearing did not. See 2017 Tr. at 9:13-16 (Court). It noted that Luevano-Sanchez has "a couple of immigration offenses, one Judge Vazquez sentenced him to [109] days back in [1996] for transporting illegal aliens then in 2009 Judge Johnson sentenced to 37 months . . . so he's been deported twice." 2017 Tr. at 9:7-11 (Court)(alteration added). The Court explained that it "didn't think the fast track range gave the Court [a] sufficient range to accurately reflect the § 3553(a) factors . . . including promoting respect for the law, and providing just punishment and affording adequate deterrence at a specific level." 2017 Tr. at 9:20-24 (Court)(alterations added). The Court explained that, while accounting for the circumstances in Mexico, there "[are] just not a lot of distinguishing factors

here that would cause the Court to not emphasize the three factors that it has talked about."  2017 Tr. at 10:1-5 (Court)(alteration added).  In sum, the Court concluded that a sentence within the Guideline range of 18 to 24 months is appropriate.  See 2017 Tr. at 9:16 (Court).

The Court then explained that a sentence of 24 months -- at the high end of the range -- is "necessary but also adequate to reflect the seriousness of the offense."  2017 Tr. at 10:5-8 (Court).  The Court explained that the sentence is "necessary to promote respect for the law and provide just punishment, afford adequate deterrence, specifically at the specific level but also at the general level," and to "protect the public."  2017 Tr. at 10:10-14 (Court).  The Court noted that the sentence is a Guidelines sentence, so it "avoids unwarranted sentencing disparity among defendants with similar records who have been found guilty of similar conduct."  2017 Tr. at 10:14-17 (Court).  The Court explained that, because Luevano-Sanchez will be deported, it "cannot use meaningfully any supervised release as a substitute . . . for incarceration," pursuant to U.S.S.G. § 5D1.1(c).  2017 Tr. at 10:18-11:6 (Court).  The Court stated that, accordingly, and because the "sentence fully and effectively reflects each of the relevant factors [in] 18 U.S.C. Section § 3553(a)," the sentence is reasonable and sufficient "without being greater than [is necessary] to comply with the purposes of punishment set forth in the Sentencing Reform Act."  2017 Tr. at 10:20-11:1 (Court).  The Court then sentenced Luevano-Sanchez to a term of imprisonment of 24 months.  See 2017 Tr. at 11:2-5 (Court).

## RELEVANT LAW REGARDING THE GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making Guidelines sentencing ranges effectively advisory.  In excising the two sections, the Supreme Court left the remainder of the Act intact, including 18 U.S.C.

§ 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable." United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551 (alterations added). To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and the defendant's character; (iii) the available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims. See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to considerable deference.

See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many").  The Guidelines are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses."  United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted). A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(alteration added).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. at 349, as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251 n.3 (10th Cir. 2008).  This presumption, however, is an appellate presumption, and not one that the trial court can or should apply.  See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91.  Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory[12]

---

[12]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the Guidelines ranges are advisory.  Gall v. United States, 522 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory . . . ."); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237

(10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory."). The Court must consider the Guidelines, see Gall v. United States, 522 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 522 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."). The Court is not mandated, however, to apply a sentence within the calculated Guidelines range.  See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . .").  Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted).  In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield.  In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances."  Irizarry v. United States, 553 U.S. 708, 710-16 (2008).  A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably.  See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

Guidelines sentence.  See  Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

> While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.).  The Supreme Court recognized, however, that the sentencing judge is "in a superior position to find facts and judge their import under § 3553(a) in each particular case."  Kimbrough v. United States, 552 U.S. at 89.  Applying § 3553(a)'s factors, the Court has concluded that the case of an illegal immigrant who re-entered the United States to provide for his two children and two siblings was not materially differentiated from other re-entry cases, and, thus, no variance from the Guidelines sentence was warranted.   See United States v. Almendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010)(Browning, J.).  Similarly, in United States v. Martinez, 184 F. Supp. 3d 1209 (D.N.M 2016)(Browning, J.), aff'd, 660 F. App'x 659 (10th Cir. 2016), the Court refused to vary the defendant's sentence downward to a sentence below the Guideline range, where the defendant had illegally re-entered the United States, largely for economic reasons and after previously serving a 24 month sentence for illegal re-entry.   See 184 F. Supp. 3d at 1240.   The Court, furthermore, sentenced the defendant to a term at the high end of the Guideline range after

---

United States v. Nolf, No. CR 10-1919-002 JB, 2014 WL 3377695, at *20-21 (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

carefully considering all of the § 3553(a) factors, including the defendant's background and history, and despite the fact that there was a violent situation going in defendant's native El Salvador -- noting that returning the defendant to El Salvador sooner rather than later would not help him.  See 184 F. Supp. 3d at 1212-46.  On the other hand, in United States v. Jager, No. CR 10–1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), although the defendant's military service was not present to an unusual degree and, thus, did not warrant a departure, the Court found that a variance was appropriate, because the defendant's military service was "superior and uniformly outstanding," as the defendant appeared to have been "trustworthy[ ] and dedicated, and he served with distinction."  2011 WL 831279, at *14.

## ANALYSIS

In  18 U.S.C.  § 3553(a), Congress  directs  courts  to  consider  numerous  factors  when imposing a sentence, including deterrence.  Although longer prison sentences may not always yield  a  significant  amount  of  deterrence  or  be  the  most  important  factor  in  the  § 3553(a) calculation, incarceration serves some deterrence function and is at least one tool in the Court's toolbox to promote deterrence.  Given that Luevano-Sanchez' history of repeatedly entering the United States illegally and that a 37-month sentence imposed in 2010 did not deter him from re-entering the United States, § 3553(a)(2) suggests that the Court should impose a sentence at the high end of the Guidelines range.  Furthermore, some of § 3553(a)'s other directives to: (i) promote  respect  for  the  law; (ii)  provide  just  punishment; (iii)  consider  the  nature  and circumstances of the offense and the history and characteristics of the defendant; and (iv) avoid unwarranted sentencing disparities all counsel that the Court should impose a sentence at the high  end  of  the  Guidelines  range.  Accordingly,  the  Court  sentences  Luevano-Sanchez  to  24-months imprisonment.

I.    **THE COURT IMPOSES A SENTENCE AT THE HIGH END OF THE GUIDELINE RANGE TO PROMOTE DETERRENCE.**

Although the Court has considered all of the § 3553(a) factors, deterrence is a significant factor in determining Luevano-Sanchez' sentence.  This case involves Luevano-Sanchez' fourth criminal conviction, and he has a history of illegally entering the United States.  See PSR ¶¶ 22-27, at 5-7.  This continual disregard of the laws of the United States -- including the United States' immigration laws -- suggests that a sentence at the high end of the Guideline range is necessary to sufficiently deter Luevano-Sanchez from committing future offenses.

Luevano-Sanchez has previously served a sentence of 37-months for the same offense, which suggests that the Court should sentence him to a longer term of incarceration to discourage him from continuing to enter the United States illegally, especially knowing that, if he ever returns, he will likely face an even higher sentence.  Section 3553(a) also directs the Court to consider the Guidelines -- and, specifically, U.S.S.G. § 2L1.2, the illegal re-entry provision -- which has changed materially since his 2010 sentencing for the same offense.  On November 1, 2016, the United States Sentencing Commission introduced new policy considerations into the sentencing calculation for illegal re-entry offenses, which its extensive research and multi-year study of immigration offenses and offenders informed.  See U.S.S.G. app. C, supp. (U.S. Sentencing Comm'n 2016).  The illegal re-entry provision was part of the original sentencing Guidelines, see U.S.S.G. § 2L1.2, at 2.102 (1987), and has since then continuously evolved.  Compare U.S.S.G. § 2L1.2, at 2.102 (1987) with U.S.S.G. § 2L1.2 (2016). See United States v. Almendares-Soto, 2010 WL 5476767, at *5 ("Over time, the Sentencing Commission materially changed the Guidelines provision regarding illegal re-entry, adding a series of prior-conviction enhancements . . . ").

The United States Sentencing Commission explains that, generally, the amendment to

§ 2L1.2

responds to three primary concerns.  First, the Commission has received significant comment over several years from courts and stakeholders that the "categorical approach" used to determine the particular level of enhancement under the existing guideline is overly complex and resource-intensive and often leads to litigation and uncertainty.  The existing guideline's single specific offense characteristic provides for enhancements of between 4 levels and 16 levels, based on the nature of a defendant's most serious conviction that occurred before the defendant was "deported" or "unlawfully remained in the United States." Determining whether a predicate conviction qualifies for a particular level of enhancement requires application of the categorical approach to the penal statute underlying the prior conviction.  See generally United States v. Taylor, 495 U.S. 575 (1990) (establishing the categorical approach).  Instead of the categorical approach, the amendment adopts a much simpler sentence-imposed model for determining the applicability of predicate convictions.  The level of the sentencing enhancement for a prior conviction generally will be determined by the length of the sentence imposed for the prior offense, not by the type of offense for which the defendant had been convicted . . . .

Second, comment received by the Commission and sentencing data indicated that the existing 16- and 12-level enhancements for certain prior felonies committed before a defendant's deportation were overly severe . . . .

Third, the Commission's research identified a concern that the existing guideline did not account for other types of criminal conduct committed by illegal re-entry offenders.  The Commission's 2015 report found that 48.0 percent of illegal re-entry offenders were convicted of at least one offense (other than their instant illegal re-entry conviction) after their first deportations . . . .

The amendment also addresses another frequent criticism of the existing guideline – that its use of a single predicate conviction sustained by a defendant before being deported or removed from the United States to impose an enhancement of up to 16 levels is often disproportionate to a defendant's culpability or recidivism risk.  The Commission's data shows an unusually high rate of downward variances and departures from the guideline for such defendants.  For example, the Commission's report found that less than one-third of defendants who qualify for a 16-level enhancement have received a within-range sentence, while 92.7 percent of defendants who currently qualify for no enhancement receive a within-range sentence.

U.S.S.G. app. C, supp. (U.S. Sentencing Comm'n 2016).  Although Luevano-Sanchez received

the 16-level enhancement and did not receive a fast-track benefit for his 37-month sentence in

2010, he benefits significantly from the amendment's gutting of the 16-level and 12-level enhancements for certain prior felonies committed before a defendant's deportation. Luevano-Sanchez benefits, because the Sentencing Commission determined after an analysis of immigration offenses and offenders that, overall, the 16-level and 12-level enhancements were overly severe. If Luevano-Sanchez had been sentenced for the present offense before November 1, 2016, under the then-effective version of § 2L1.2, Luevano-Sanchez would have sustained a 12-level enhancement for his transporting-of-illegal-aliens-offense.[13]  Under the current version of § 2L1.2, however, he received no enhancement for the offense.[14]

In sum, under the current version of § 2L1.2, Luevano-Sanchez received a 4-level enhancement for his previous illegal re-entry, as opposed to a 12-level enhancement he would have received under the previous version of § 2L1.2, and an additional 4-level enhancement for his 2015 drug-trafficking conviction. While Luevano-Sanchez benefits overall in terms of a lower Guidelines range, he nevertheless has no reason to suspect that the punishment with this particular offense would not reflect the fact that he was undeterred after serving a 37-month sentence for the same offense. Here, deterrence is a factor that overwhelmingly supports a sentence at the high end of the Guidelines range -- which in this case is 24 months.

---

[13]Luevano-Sanchez would have incurred a 12-level enhancement for his conviction for transporting illegal aliens, as opposed to the 16-level enhancement that he received corresponding to that conviction when he was sentenced for his illegal re-entry conviction in 2010, because the conviction for transporting illegal aliens does not receive criminal history points in the calculation of the present sentence. See PSR ¶ 22, at 5.

[14]The current version of § 2L1.2, under Application Notes, states: "For purposes of applying subsections (b)(1), (b)(2), and (b)(3), use only those convictions that receive criminal history points under § 4A1.1(a), (b), or (c)." U.S.S.G. § 2L1.2 cmt. n.3. (U.S. Sentencing Comm'n 2016). Luevano-Sanchez' conviction for transporting illegal aliens did not receive criminal history points in the calculation of the present offense, see PSR ¶ 22, at 5, and thus does not count as a conviction for calculating total offense points under § 2L1.2(b)(2).

In other words, the Court concludes that this sentence, which is shorter than the prior sentence that Luevano-Sanchez served for the same offense only because of the substantial changes made to the Guidelines, is justifiably at the high end of the guidelines range to effectively deter Luevano-Sanchez from illegally reentering the United States. The Court cannot ignore Luevano-Sanchez' history of repeated immigration offenses and, especially, that his prior two deportations stemmed from his involvement in felonious criminal activity. Furthermore, Luevano-Sanchez recently served an abbreviated punishment for yet another entanglement in drug-trafficking in 2015. He will be removed for the third time after he serves this 24-month sentence. In light of this established pattern of illegally reentering the United States and engaging in criminal behavior while he remains here, specific deterrence is a significant factor in the calculation for determining his sentence, and it counsels a sentence at the high end of the Guideline range.

In addition to specific deterrence, however, the Court must also concern itself with general deterrence. See United States v. Corchado-Aguirre, 2015 WL 10383207, at *28. Although "lengthy prison sentences" may not deter a particular defendant, increasingly longer prison sentences serve a general deterrent function, thereby deterring others from committing a similar crime. Daniel S. Nagin, Deterrence in the Twenty-First Century, 42 Crime & Justice 199, 201 (2013)(stating that increasingly longer prison sentences can have appreciable deterrent effects when defendants at the beginning face a relatively shorter sentence). See Roger Warren, Evidence-Based Practice to Reduce Recidivism: Implications for State Judiciaries, National Center for State Courts 24-25 (2007)(observing that the current sentencing policies reflect the goal of general deterrence); Mark W. Lipsey & Francis T. Cullen, The Effectiveness of Correctional Rehabilitation: A Review of Systematic Reviews, 3 Ann. Rev. L. & Soc. Sci. 299

(2007)(observing that the existence of a criminal justice system that threatens wrongdoers with arrest and punishment deters many from crime, when they would likely break the law if there were no risk of detection and penalty).  Professors Lipsey and Cullen state: "Our focus here, however, is not on the nature and effects of that general deterrent effect but, rather, on what is often called specific deterrence."  Lipsey & Cullen, supra, at 299. Section 3553(a) does not direct the Court to consider "specific" deterrence; it directs the Court to consider "deterrence," which includes both specific deterrence and general deterrence.  United States v. Corchado-Aguirre, 2015 WL 10383207, at *28.  Even if the specific deterrence may be negligible, the Court can still further the goal of promoting general deterrence through the imposition of prison sentences.

The Court has previously described how the literature largely demonstrates that incarceration serves a general deterrent function:

> There is . . . comparatively more support for incarceration's general-deterrence value.  An economic model of crime would have individuals committing crimes only when the benefit to the individual of committing the crime ($f$, for "fruits") outweighs the product of the likelihood of getting caught and brought to justice ($c$, for "certainty") multiplied by the detrimental impact of the punishment on the individual ($s$, for "severity").  If $f > c \cdot s$, the individual will commit the crime, and if $f < c \cdot s$, the individual will not commit the crime.  The Court notes that this theory is not fully workable as written; several factors -- many of which would vary from person to person -- would need to be established.  For example, $s$ and $f$ would have to be put into the same units.  Commonly, $s$, the punishment for a crime, starts out in units of months of incarceration; $f$, the crime's benefit to the criminal, often starts out in units of dollars.  A conversion factor would have to be established that essentially asks how much an individual would have to be paid to spend a month in prison.  This conversion factor would likely vary from person to person, both on the basis of idiosyncratic personal preferences and for rational, predictable reasons, e.g., an 80-year-old man with millions of dollars might be less apt to trade prison time for money than a 30-year-old without a cent to his name.  Even a single person likely has more than one conversion factor, which marginally fluctuates over the number of months of incarceration involved; for example, there are often immense social and reputational costs to a person for serving his or her first month in prison -- i.e., for being convicted and incarcerated at all -- but these costs are for the most part one-time-only, and do not double or triple upon serving two or three months in prison. The model would also have to account for: (i) the possibility of being arrested but

not convicted, which might entail social and reputational costs, and even some jail time; (ii) the possibility of being suspected but not arrested, which may entail social and reputation costs; and (iii) the uncertainty, at the time the crime is committed, of what the exact punishment will be if convicted.    These "intermediate" outcomes -- between the polar outcomes of being convicted, on one hand, and getting away scot free, on the other -- necessitate transforming the right-hand side of the model formula into an integral, in which the various possible outcomes are assigned a probability, their detrimental impact multiplied by that probability, and each possible outcome's consequent product added together to obtain a final sum, which represents $c \cdot s$.  Analogous issues exist on the left-hand side of the formula -- the expected value of committing the crime.  It is often not clear before committing the crime how much money -- or other non-monetary benefit, which can then be assigned a monetary equivalent -- will be earned by committing the crime, and, thus, the various possibilities and their corresponding likelihoods must be integrated.

None of these snags is fatal to the economic model; they just make the model's inputs difficult to obtain, and, in some cases, practically unknowable.  The model is theoretically sound, and accurately describes how an informed, rational actor would treat the decision whether to commit a crime.  Even though most criminals are not, themselves, "informed, rational actors," one would expect that their behavior would, <u>on average</u>, reflect the rational pursuit of incentives, <u>i.e.</u>, individuals who should not rationally commit crimes will commit them at roughly the same rate that individuals who "should" rationally commit crimes refrain from committing them, and thus the irrationalities in both directions cancel out, resulting in net rational behavior.  Thus, under the economic model, all Congress has to do to root out crime is to ensure that the crime's punishment and detection rate are sufficiently high to greatly outweigh the average fruits of the crime.  This end can be effectuated equally well with either severity of punishment or certainty of detection, as a proportional increase to either has the same effect on the right side of the equation.

The model, however, does not work in the real world; it has been falsified by empirical research.  The model is dead, and facts, not theory, killed it.  If the model held true in the real world, doubling the punishment severity of a crime would deter the same portion of potential criminals as doubling the certainty of detection, and halving a crime's punishment would galvanize the same number of new criminals and halving the detection rate.  For example, consider a crime with a certainty of 20% and a severity of 10 years, and assume that 100 people commit this crime.  Now assume that the certainty was raised -- by way of increased resources devoted to police, investigation, prosecution, etc. -- to 40%.    The number of people who commit the crime would go down from 100 to $x$.  This figure, $x$, is not a predictable number, *i.e.,* it is not necessarily 50, because to determine $x$'s value one would have to know more about *f*, and where $c \cdot s$ stood in relation to it both before and after the certainty modification.  Now assume, instead, that the certainty was left at 20% but the punishment was raised from 10

years to 20 years.  The number of people who commit the crime would again go down from 100 to *x,* and, although *x* would still be an unpredictable number, it would be the same number as the number of people who committed the crime when the detection rate was doubled.

An avalanche of criminological studies have determined that this theoretical symmetry between severity of punishment and certainty of detection does not exist in the real world.  See Isaac Ehrlich, Participation in Illegitimate Activities: A Theoretical and Empirical Investigation, 81 J. Pol. Econ. 521, 544-47 (1973)(finding that the certainty of punishment was a more important indicator than severity in deterring murder, rape, and robbery); Harold G. Grasmick & George J. Bryjak, The Deterrent Effect of Perceived Severity of Punishment, 59 Soc. Forces 471, 472 (1980)(reviewing twelve deterrence studies and explaining that "nearly all these researchers conclude that perceived certainty of legal sanctions is a deterrent, [while] only one (Kraut) concludes that perceptions of the severity of punishment are part of the social control process"); Jeffrey Grogger, Certainty v. Severity of Punishment, 29 Econ. Inquiry 297, 304 (1991)(studying California arrestees and concluding that "increased certainty of punishment provides a much more effective deterrent than increased severity" and that a "six percentage point increase in average conviction rates would deter as many arrests as a 3.6 month increase in average prison sentences"); Steven Klepper & Daniel Nagin, The Deterrent Effect of Perceived Certainty and Severity of Punishment Revisited, 27 Criminology 721, 741 (1989)(surveying graduate students about tax evasion scenarios and finding that certainty of punishment is an effective deterrent); Daniel S. Nagin, Criminal Deterrence Research at the Outset of the Twenty–First Century, 23 Crime & Just. 1, 13 (1998)(reviewing the literature and concluding that "cross-sectional and scenario-based studies have consistently found that perceptions of the risk of detection and punishment have negative, deterrent-like associations with self-reported offending or intentions to offend"); Daniel S. Nagin & Greg Pogarsky, An Experimental Investigation of Deterrence: Cheating, Self–Serving Bias, and Impulsivity, 41 Criminology 167 (2003)(testing whether students would cheat on a trivia quiz to earn a cash bonus and finding that cheating decreased when the certainty of detection was higher but not when the perceived severity of punishment increased); Ann Dryden Witte, Estimating the Economic Model of Crime with Individual Data, 94 Q.J. Econ. 57, 79 (1980)(studying men released from the North Carolina prison system and demonstrating that "a percentage increase in the probability of being punished has a relatively larger effect on the number of arrests or convictions than does a percentage increase in the expected sentence"); Andrew von Hirsch et al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research 47 (1999); Robert Apel & Daniel S. Nagin, General Deterrence: A Review of Recent Evidence, in Handbook on Crime and Criminal Justice (Michael Tonry ed.)(2011); Alfred Blumstein & Daniel Nagin, The Deterrent Effect of Legal Sanctions on Draft Evasion, 29 Stan. L. Rev. 241, 269 (1977)(studying draft evasion and finding a significant negative association between the probability of conviction and the draft evasion rate, leading the authors to conclude that their

"findings are consistent with the work of other investigators who have argued that the certainty of punishment has a stronger deterrent effect on crime than the severity of punishment"); Aaron Chalfin & Justin McCrary, Criminal Deterrence: A Review of the Literature, J. Econ. Literature (forthcoming).  Studies universally find that certainty of punishment has a far greater deterrent effect than severity of punishment. It is difficult to pin down the extent to which real-world (empirical) findings deviate from the one-to-one rate predicted by the economic model -- i.e., whether certainty is twice as important, three times as important, or ten times as important--as it appears to differ in different contexts.  Interestingly, studies also agree that another factor, which is entirely absent from the economic model, works to determine deterrence: the immediacy, or celerity, with which the crime is detected and the punishment meted out.  The above studies generally find that both certainty and celerity have a greater impact on deterrence than severity.

It is not clear why certainty is so much more effective than severity at deterring criminal behavior; as is the case in many contexts, empirical studies can identify the "what" but not the "why."  It is even less clear why celerity plays any role in a potential criminal's decision.  The Court suspects that the average street-level potential criminal is more well-informed about the likelihood of getting caught, and the quickness with which he will be caught, than he is about the sentence he will receive.  From there, the potential criminal uses the information he has on hand to make his decision, and largely disregards the impact of severity, rather than trying to seek out specific information.  Drug trafficking defendants, aliens returning after being deported, and Indians off the reservation are often shocked at the severity of federal sentences as compared to prior sentences they may have received in state and tribal systems; in the Court's experience, most federal defendants have no idea how harsh federal sentences are, which would obviously prevent them from acting as an effective deterrent.

What is clear, however, is that severity of punishment continues to have some deterrent effect -- albeit less than it would were the universe of potential criminals an overall rational bunch.  See, e.g., Daniel S. Nagin, Deterrence: A Review of the Evidence by a Criminologist for Economists, 2013 Annual Rev. Econ. 5:83, 86-88, 97-98 (2013).  It also seems likely that the behavior of sophisticated potential criminals would hew more closely to the economic model than that of unsophisticated, street-level criminals.  Thus, general deterrence remains an important consideration . . . .

United States v. Courtney, 76 F. Supp. 3d at 1304 n.13 (emphasis in original).  See United States

v. Luna–Jasso, 2015 WL 1006390, at *15-18 (D.N.M. Feb. 19, 2015)(Browning, J.)(alterations

added)(footnote omitted)(refusing to depart or vary in conviction for violating the United States'

immigration laws and concluding that a guideline sentence would have a greater deterrent effect

than the sentence that the defendant requested).    Therefore, general deterrence remains an

important consideration, especially in cases like this one, where the defendant has reason to

suspect, based on having served a lengthy sentence for the same offense in the past, that the

punishment will increase -- or, at least fall at the high end of the guideline range -- with this

particular offense.[15]

Courts can further deterrence through intense rehabilitation and prevention programs.

See Warren, supra, at 32-33.    Without those programs available in this instance, however,

Luevano-Sanchez cannot show how the Court can further deterrence without incarceration.    For

example, given that Luevano-Sanchez will be deported immediately after he serves his sentence,

he will not be eligible for any programs on supervised release that might help him avoid

reentering the United States for economic reasons or otherwise.

> As a result, the Guidelines advise that sentencing courts should not ignore
> "unsupervised" supervised release.    While some judges impose supervised release
> in sentences like this one, the Court has always thought such an approach is a bit
> like kicking the can down the road, postponing the tough decision on what to do
> with an alien who continues to enter the United States illegally.    The Court has

---

[15]The Court notes that deterrence likely plays a larger role with respect to illegal reentry from Mexico.    While the Court acknowledges that border patrol agent staffing is only one causal determinant of the number of illegal border crossings, the Court nevertheless notes that as border patrol agent staffing more than doubled -- from 9,212 to 21,391 agents -- over the fiscal years 2000 to 2013, illegal alien apprehensions from Mexico dramatically decreased over the same time period, from 1,636,883 to 267,734 persons.    Compare United States Border Patrol Agent Nationwide    Staffing    by    Fiscal    Year    (as    of    October    1,    2016), https://www.cbp.gov/sites/default/files/assets/documents/2016-Oct/BP%20Staffing%20FY1992-FY2016.pdf (last visited July 13, 2017), with United States Border Patrol Illegal Alien Apprehensions    From    Mexico    By    Fiscal    Year    (Oct.    1st    through    Sept.    30th), https://www.cbp.gov/sites/default/files/assets/documents/2016-Oct/BP%20Total%20Apps%2C%20Mexico%2C%20OTM%20FY2000-FY2016.pdf (last visited July 13, 2017).    Further, in fiscal year 2016, the Court notes that there were 192,969 illegal alien apprehensions -- approximately 11.8% of the FY 2000 level.    See United States Border Patrol Illegal Alien Apprehensions From Mexico By Fiscal Year (Oct. 1st through Sept. 30th), https://www.cbp.gov/sites/default/files/assets/documents/2016-Oct/BP%20Total%20Apps%2C%20Mexico%2C%20OTM%20FY2000-FY2016.pdf (last visited July 13, 2017).

not adopted that approach. The Court believes that it is more appropriate to bite the bullet and devise an appropriate sentence now for the crime and defendant before the Court. It thinks it should do what the Guidelines recommend and not impose supervised release, rather than saying someone will punish the defendant severely -- maybe -- next time.

While parts of the article Deterrence in the Twenty-First Century suggest that longer prison sentences do not achieve a significant amount of deterrence, they do not indicate that longer prison sentences yield no general deterrent effects at all. See Nagin, Deterrence in the Twenty-First Century, supra, at 230. Rather, the article argues that the marginal deterrence from an incrementally longer sentence is not great enough to counterbalance the increased social and economic costs involved in incarcerating a person for that greater length of time. See Nagin, Deterrence in the Twenty-First Century, supra, at 201. Scholars concede that "California's third strike provision," which imposes substantially higher prison sentences for three-time offenders, "does indeed have a deterrent effect." Nagin, Deterrence in the Twenty-First Century, supra, at 230. Nagin argues only that, "on the basis of a cost-benefit analysis, [ ] the crime-saving benefits are so much smaller than the increased costs of incarceration . . . " Nagin, Deterrence in the Twenty-First Century, supra, at 230. The political branches -- not the courts -- should address any argument whether to incarcerate or not incarcerate on the basis of cost. If incarceration can achieve more deterrence, the court should not refuse to incarcerate because of costs. Any argument that the marginal deterrence does not justify the cost should be made to Congress, who has the power to change the factors that judges may consider when imposing sentences.

Nagin's article supports the understanding that increasing the length of a defendant's sentence can have a material deterrent effect. Specifically, he argues that increased "increments in short sentences do have a material deterrent effect." Nagin, Deterrence in the Twenty-First Century, supra, at 231. See Nagin, Deterrence in the Twenty-First Century, supra, at 201 (stating that, in contrast, "there is little evidence that increases in the length of already long prison sentences yield general deterrent effects that are sufficiently large to justify their social and economic costs"). His compilation of the research reveals that there are diminishing marginal deterrent returns to increasing sentence length. See Nagin, Deterrence in the Twenty-First Century, supra, at 229-32. One can compare the marginal utility of lengthier prison sentences to the law of diminishing marginal utility. The law of diminishing marginal utility is an economic concept holding that, as a person increases consumption of a product, there is a decline in the marginal utility that person derives from consuming each additional unit of that product. Kemezy v. Peters, 79 F.3d 33, 35 (7th Cir. 1996)(Posner, J.)(applying the principle to a punitive damages issue and arguing that the "losing $1 is likely to cause less unhappiness (disutility) to a rich person than to a poor one"); United States v. Valencia, 2015 WL 9703436, at *40 n.23 (D.N.M. Dec. 31, 2015)(Browning, J.)(describing the theory of diminishing marginal utility and observing that a "defendant making $1,000,000.00 per year

could likely weather a 50-percent-of-total-income fine much more comfortably than a defendant making $20,000.00 per year, even though the two fines, as a fraction of income, are the same"). For example, the first plate of food one eats at a buffet is very good. Once that person's hunger has been somewhat sated, however, the person's enjoyment of the second plate of food significantly diminishes. If this person continues eating, he or she would eventually reach a point at which an additional plate of food would [likely] provide [ever less] utility.

Nagin's compilation of research suggests that prison sentences may abide by the same principle. See Nagin, Deterrence in the Twenty-First Century, supra, at 231. Nagin agrees that "increments in short sentences do have a material deterrent effect on a crime-prone population." Nagin, Deterrence in the Twenty-First Century, supra, at 231. Lengthier sentences may continue to provide increased marginal deterrence up to a point at which the increased deterrent value levels. See Nagin, Deterrence in the Twenty-First Century, supra, at 231. Accordingly, research strongly indicates that increases in sentence length have at least some general deterrent effect -- especially for criminals facing shorter sentences. The Court has arrived at this conclusion on multiple occasions, determining that the "severity of punishment continues to have some deterrent effect -- albeit less than it would were the universe of potential criminals an overall rational bunch."

United States v. Courtney, 2014 WL 7472975, at *32 n.13 (citing Daniel S. Nagin, Deterrence: A Review of the Evidence by a Criminologist for Economists, 2013 Annual Rev. Econ. 5:83, 86-88, 97-98 (2013)). See United States v. Luna-Jasso, 2015 WL 1006390, at *15-18.

A prison sentence at the high end of the Guidelines range should effectively deter Luevano-Sanchez in particular from reentering the United States. Even if incarceration may not decrease recidivism rates at large, it may impact specific individuals based on their particular characteristics. See Lipsey & Cullen, supra, at 302 (stating that "[s]imple recidivism rates are largely a function of the input characteristics of the respective offenders, especially risk characteristics such as prior offense history, age, and gender"). Luevano-Sanchez has a history of entering the United States illegally. He admitted to entering the United States illegally on November 27, 1995, and was deported for the first time on March 27, 1996. See PSR ¶ 22, at 5. Subsequently, Luevano-Sanchez served 37 months in prison for illegal re-entry and was again

deported on February 9, 2012.  See PSR ¶ 23, at 5-6.  Although § 3553(a) does not, as a rule, call for the imposition of a higher sentence, the sentencing range that Luevano-Sanchez requests -- 12 months and 1 day to 18 months -- is substantially less than the 37-month sentence he received in 2010 for the same offense.  Luevano-Sanchez provides no evidence for why a sentence below the Guidelines range would adequately deter him, especially the in light of the fact that a 37-month sentence did not permanently deter him from reentering the United States.  In a situation where the defendant has not demonstrated any situational differences between his last re-entry and this re-entry, as here, the Court has no sound reason to conclude that a sentence below the guideline range will deter him now, when it did not permanently deter him in the past. Accordingly, § 3553(a)'s deterrence objective suggests that the Court should impose a sentence at the high end of the Guidelines.

## II.    THE REMAINING § 3553(a) FACTORS INDICATE THAT THE COURT SHOULD IMPOSE A SENTENCE AT THE HIGH END OF THE GUIDELINES RANGE.

In addition to promoting deterrence, § 3553(a) directs courts to promote respect for the law and provide for just punishment.  See 18 U.S.C. § 3553(a)(2)(A).  Luevano-Sanchez has been deported twice before this conviction -- first in 1996 and again in 2012 -- and will be deported again after he serves his sentence in this case.  He has four criminal convictions, including this one.  Each time Luevano-Sanchez enters this country without authorization, the United States devotes valuable resources to arresting him, prosecuting him, and deporting him. By continuing to illegally enter the United States, Luevano-Sanchez disregards the law and the resources that the United States devotes to upholding the law. Because this conviction is Luevano-Sanchez' third immigration conviction, a sentence at the high end of the sentencing Guidelines -- which, in this case is still considerably less than the 37-month sentence he received in 2010 -- is necessary to promote respect for the law and to provide a just punishment.  See

United States v. Corchado-Aguirre, 2015 WL 10383207, at *28.  Accordingly, § 3553(a)(2)(A) suggests that the Court should impose a sentence at the high end of the Guidelines range.

Regarding the need to protect the public, the Court notes Luevano-Sanchez' prior immigration violations, including his 2009 illegal re-entry offense and two prior deportations, as well as his 1995 transporting of illegal aliens offense and his recent 2015 drug-trafficking offense.  These offenses are serious, and drug-trafficking, in particular, endangers the public.  A sentence at the high end of the Guidelines range is a recognition of the need to protect the public from drug-trafficking harms.

Under § 3553(a)(1), the Court also must consider "the nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  Luevano-Sanchez asks the Court to consider the situation that the drug cartels in Zacatecas cause in considering the nature and circumstances surrounding the offense.  See Sentencing Memorandum at 3.  Luevano-Sanchez reminds the Court that the Zeta Drug Cartel pressured him to assist with their operations when he was returned to Zacatecas in 2012.  See Sentencing Memorandum at 3.  He stated that he felt threatened by the Cartel's pressure, which had "some influence in terms of [him] coming back to the United States."  Jan. 3. Tr. at 5:20-22 (Keefe).  While the Court is sympathetic to his situation in Mexico and the dangers he faced in 2012, it is not sure how this consideration supports Luevano-Sanchez' argument.  While Luevano-Sanchez plans to return to Zacatecas to live with his siblings, he does not cite to any situational changes suggesting that he would face any less pressure to submit to threats from the Zetas Drug Cartel if returned sooner than later.  Rather, he merely "hopes things have calmed down."  Jan. 3. Tr. at 5:16-17 (Keefe).  Moreover, even if Luevano-Sanchez felt that he could not stay in Zacatecas,

that probably did not mean he should come to the United States again illegally, rather than go somewhere else in Mexico.

While Luevano-Sanchez refers to the pressure he faced from the Zeta Drug Cartel in 2012, it appears, however, that a primary motive for his most recent return to the United States -- and for coming to the United States originally -- was employment opportunities.  See Sentencing Memorandum at 3.  He asserts that he initially entered the United States for "the employment opportunities," as is the case "with almost all other Mexican Nationals who enter the United States."  Sentencing Memorandum at 2.  He asserts that he "stayed in the Santa Fe area because he was able to financially provide for himself and his family."  Sentencing Memorandum at 2-4. He further asserts that he is a hard worker, and wants to be able to financially provide for himself and his family, but notes that he "will not be able to make the same income working in Mexico." Sentencing Memorandum at 3.  In other words, Luevano-Sanchez twice returned to the United States -- first, after his 1996 deportation and once again following his 2012 deportation -- to continue to seek economic opportunities to support his family.  See Sentencing Memorandum at 3.  Consequently, Luevano-Sanchez continues to reenter the United States primarily for the same reason that many defendants -- particularly from Mexico -- to make a living.  In many ways, Luevano-Sanchez is no different than the thousands of Mexicans who come to the United States for better jobs.  In other words, nothing about the nature and circumstances of the offense counsels for a variance.  See United States v. Martinez, 184 F. Supp. 3d at 1240 ("Moreover, while Martinez refers generally to the dangerous situation in El Salvador, it appears that his primary reason for returning to the United States after being deported in 2012 was . . . for largely economic reasons . . . . In other words, there is nothing in the offense's nature and circumstances that counsels for a variance . . . .").

Similarly, Luevano-Sanchez' history and characteristics do not warrant a variance. Luevano-Sanchez states that he has three children who reside in the United States.  See Sentencing Memorandum at 4.  He contends that he has lived in the United States, working to support his children, for more than half of his life.  See Sentencing Memorandum at 2-3.  Like Luevano-Sanchez, many defendants who are convicted of illegal re-entry have lived in the United States for numerous years and have family members who still reside in the United States.  Furthermore, many undocumented immigrants are separated from their family members, either by coming to the United States while their family remains in their country of origin, or by being deported while they have family members that reside in the United States.  The Court, accordingly, does not conclude that these circumstances warrant differentiation from other cases.  See United States v. Almendares-Soto, 2010 WL 5476767, at *12 ("Almendares-Soto alleges that his two children, as well as two of his siblings, reside in the United States . . . .  Although the circumstances are unfortunate, the Court does not believe that these circumstances warrant differentiation from other cases.  There are many defendants who have family on both sides of the border.").  Because the Court concludes that Luevano-Sanchez' circumstances do not warrant differentiation from other cases, and because it must weigh Luevano-Sanchez' familial ties against the other § 3553(a) factors, such as Luevano-Sanchez' criminal history, it concludes that Luevano-Sanchez' history and characteristics do not warrant a downward variance.

Next, pursuant to § 3553(a)(6), the sentence "avoid[s] unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  The Court agrees that Congress is comfortable with sentencing disparities between Fast-Track eligible and non-Fast-Track eligible defendants.  See United

States v. Duarte-Hurtado, 295 F. App'x 273 (10th Cir. 2008).[16]  The Court does not, however, give Luevano-Sanchez a higher sentence simply to correct any such disparity. It stated, rather, that a sentence pursuant to the fast track program did not "properly reflect the § 3553(a) factors . . . including promoting respect for the law, and providing just punishment and affording adequate deterrence at a specific level," and despite Luevano-Sanchez' circumstances in Mexico, "a sentence of 24 months, the high end of the range[,] is necessary but also adequate to reflect the seriousness of the offense . . . [given his] criminal history here in the United States that [is] not immigration related," and to "protect the public."  2017 Tr. at 10:13-11:14 (Court)(alterations added).  In other words, the Court is not imposing a sentence at the high end of the Guidelines range solely based on the 37-month sentence that Judge Johnson imposed in 2010, where there was no fast-track plea agreement.  The Court merely observes that a 24-month sentence avoids any unwarranted disparities among defendants with similar records who have been found guilty of similar conduct, thereby complying with precedent from both the Ninth and Tenth Circuits.  In United States v. Gonzalez-Zotelo, 556 F.3d 736 (9th Cir. 2010), the defendant's original Guidelines range was 63 to 78 months.  See 556 F.3d at 738.  The United States District Court for the Southern District of California first concluded that the criminal history overrepresented

---

[16]United States v. Duarte-Hurtado is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent . . . . And we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that United States v. Duarte-Hurtado has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

the defendant's criminal history and departed downwards, resulting in a new range of 51 to 63 months imprisonment.  See 556 F.3d at 738.  Despite this new range, the court sentenced the defendant to 30 months imprisonment solely to reduce sentencing disparities between the defendant, who was not participating in the fast-track program, and another fast track eligible defendant who had committed a similar crime.  See 556 F.3d at 738.  The Ninth Circuit held that the Southern District of California erred by imposing a significantly lower-than-Guidelines sentence solely to reduce a sentencing disparity that Congress had found to be warranted.  See 556 F.3d at 739-41.

The Court does not commit the same error that the Ninth Circuit reversed in United States v. Gonzalez-Zotelo.  First, the Court notes that it does not impose a 24-month sentence to reduce sentencing disparities between Luevano-Sanchez and other defendants who are not eligible for the fast track program, like the Southern District of California did in United States v. Gonzalez-Zotelo.  See 556 F.3d at 738.  Instead, the Court relies on numerous other § 3553(a) factors to reach its conclusion that it should impose a 24-month sentence.  Accordingly, it is not rejecting or disagreeing with Congress' approval of fast-track plea bargaining programs; that policy decision is one for Congress to make.  Second, the Southern District of California had to depart downward 21 to 33 months to reach its sentence.  See 556 F.3d at 738.  The Ninth Circuit in United States v. Gonzalez-Zotelo reversed the Southern District of California's downward departure.  See 556 F.3d at 741.  In contrast, the Court's sentence of 24-months is a Guidelines sentence.  The Court makes no departures or variances to match Luevano-Sanchez to non-fast-track eligible defendants.  Notably, a sentence of 24 months -- at the high end of the sentencing Guideline -- is lower than his prior sentence of 37 months for the same offense, largely because of changes made to the Guidelines illegal re-entry provision.  If the Court wanted to reduce

sentencing disparities between the Court's 2010 sentence and the Court's 2017 sentence, the Court would need to impose a higher sentence -- outside the Guidelines range -- considering that Luevano-Sanchez has re-entered the United States in spite of the 37-month sentence and is pleading guilty to a new criminal offense.  Instead, the Court relies on the § 3553(a) factors in the aggregate to arrive at its 24-month sentence.

Similarly, in United States v. Duarte-Hurtado, the Tenth Circuit affirmed the Court for refusing to vary the defendant's sentence solely to match defendants in the fast-track program. See 295 F. App'x at 276.  Although the Court varied from the defendant's Guidelines sentence, it did so on the basis of the defendant's particular circumstance and concluded that the § 3553(a) factors in the aggregate suggested that a below-Guidelines sentence was appropriate.  See 295 F. App'x at 278-99.  The Tenth Circuit described the Court's approach:

> Next, it is evident the district court carefully weighed each of the circumstances presented, together with the § 3553(a) factors, in determining whether to grant a variance, and that one of the sentencing factors it believed tipped the balance in favor of granting the variance was § 3553(a)(6).  In applying this factor, the district court explained that a sentence of forty-one months, at the low end of the Guidelines range, would not reflect the same length of sentence received by people who committed similar crimes and have similar records to Mr. Duarte-Hurtado.  It then concluded that in "[t]aking into consideration this factor, as well as the other variance factors . . . discussed," it believed "a sentence of 36 months balances these factors best." R., Vol. 1, Doc. 31 at 30.  Thus, it is clear no procedural error occurred.  Further, under *United States v. Smart*, 518 F.3d 800 (10th Cir. 2008), we may not examine the weight assigned to any one factor in determining the substantive reasonableness of Mr. Duarte-Hurtado's sentence, and, instead, give due deference to the district court's decision [regarding] the § 3553(a) factors, on a whole, justified the extent of the variance given.  *See* 518 F.3d at 808.

United States v. Duarte-Hurtado, 295 F. App'x at 278 (alterations added).  Like the Court did in United States v. Duarte-Hurtado, it determines that the § 3553(a) factors, on a whole, justify the 24-month Guidelines sentence it imposes.

Furthermore, to determine whether "unwarranted sentencing disparities" exist, the Court looks beyond sentences that New Mexico federal courts impose, and also considers sentences that other courts along the border and across the county impose. Looking exclusively at sentences that New Mexico federal courts impose may be too narrow, because New Mexico sentences may be anomalous when compared to a broader sample. By not accepting either the Fast Track Plea Agreement or the Amended Plea Agreement, which retained a fast-track downward departure, and sentencing Luevano-Sanchez to 12 months and 1 day or to a sentence at or below the low end of the Guidelines range of 18 to 24 months, the Court is also not creating an unwarranted disparity with those who are sentenced under the "nationwide" fast track program.

The Court looks beyond the District of New Mexico to determine whether a sentencing disparity exists. The Court has described the history of the fast-track policies previously:

> In the PROTECT Act of 2003, [Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003, Pub. L. No. 108-21, 117 Stat. 650 (2003),] Congress gave the U.S. Attorney for each district the authority to create a fast-track or early disposition program for criminal cases. [PROTECT Act § 401(m)(2)(B), 117 Stat. 650, 675 (2003)(codified as amended at 28 U.S.C. § 994 (2006)).] Under a fast-track program, the defendant receives a downward departure of 1 to 4 levels if they accept an early plea. [PROTECT Act § 401(m)(2)(B)] In the District of New Mexico, a defendant charged with the felony of illegal re-entry could get a three-level departure if he has not committed a violent crime. [U.S. Sentencing Commission Guidelines Manual (2013), http:// www.ussc.gov/sites/default/files/pdf/Guidelines-manual/2013/manual-pdf/2013_Guidelines_Manual_Full.pdf (hereinafter Guidelines Manual)]. If he had committed a violent crime in his past, he could still get a one-level departure. [Guidelines Manual]

> As an example of the pre-fast-track sentencing structure, if the defendant was here illegally and committed a drug-trafficking crime in 2003, his base offense level would be at 8 for the crime of re-entry with a 12-level enhancement for the drug trafficking crime. [Guidelines Manual] His offense level of 20 would have been reduced three levels if he accepted responsibility, leaving him with an offense level of 17. [Guidelines Manual] With a criminal history at level II, the guideline range for his sentence would have been 27 to 33 months.

[Guidelines Manual]   When the judicial author of this Article came onto the bench in 2003 before Blakely v. Washington, [See Blakely v. Washington, 542 U.S. 296 (2004)] and United States v. Booker, [See 543 U.S. 220 (2005),] which turned the previously mandatory sentencing Guidelines into advisory sentencing Guidelines, the criminal offender mentioned above would have received a sentence of 27 months.

Starting on October 24, 2003, the District of New Mexico began following the fast-track program.  [Memorandum from James B. Comey, Deputy Attorney General, U.S. Dep't Justice, Authorization of Early Disposition Programs (Oct. 29, 2004), reprinted in 21 Fed. Sent. Rptr. (Vera) 322, 323 (2010).]  Under the fast-track program, the same defendant as above would have received an extra three-level downward departure for accepting the plea early.  [Guidelines Manual, supra.]  As a result, his offense level would have been reduced to 14, and with a criminal history at level II, the guideline range would call for a sentence between 18 and 24 months.  [Guidelines Manual]

Then, in early 2012, the DOJ decided to standardize the fast-track programs across all districts.  [Memorandum from James M. Cole, Deputy Attorney General, U.S. Dep't Justice, Department Policy on Early Disposition or "Fast-Track" Programs (Jan. 31, 2012), available at http://www.Justice.gov/dag/fast-track-program.pdf ("Cole Memo").]   If a U.S. Attorney wants to implement a fast-track program, he or she has to use the one the DOJ drafts. [Cole Memo.]  Before this, the U.S. Attorney for each district could tailor the program he or she implemented to the individual district.  For the District of New Mexico, this individualization meant that the same defendant as above would no longer get a four-level downward departure, but instead would get only the three-level departure implemented in 2003.  With an offense level of 13 and criminal history still at II, the sentence range for this particular post-2012 defendant would now be between 15 and 21 months.  The District went from a typical sentence of 27 months in early 2003 to a 15-month sentence in 2013.

Adding some complexity to the discussion is that some districts can and do choose to not implement a fast-track program at all.  [See Cole Memo.]  As a result, sentences in the District of New Mexico tend to be lower than the sentences in those districts.  Moreover, in some districts, not every defendant would be charged with a felony.  In fact, most are charged with misdemeanors, so those other districts charging misdemeanor will likely impose shorter sentences than New Mexico's felony sentences.   There has been a steady downward pressure on sentences for illegal re-entry, especially in the border districts, but it is possible that in non-fast-track districts, the prosecutor's decision to charge the illegal immigrant with a misdemeanor or felony could place them either below or above the sentence she or he would receive in New Mexico.

In fact, outside the border districts, such as in the Northern District of Texas, some of the judges can give sentences that are twice as long as those given

out in New Mexico for similar re-entry crimes.  For example, the judicial author once had a defendant in front of him who was sentenced to 96 months by a Northern District of Texas judge, but in New Mexico he ended up getting sentenced to 18 months.  [United States v. Calderon-Ramirez, CR 07-2066 JB, 2008 WL 2397661 (D.N.M. Jan. 30, 2008).]

It has been the policy of the judges of the District of New Mexico that they sentence a re-entry defendant to time served as soon as possible.  This policy is exhibited in a number of different ways.  The District stations two district judges in Las Cruces, New Mexico.  [See District of New Mexico Judges, U.S. District       Court,       District       of       New       Mexico, http://www.nmcourt.fed.us/web/DCDOCS/files/judges.html (last visited Jul. 17, 2017)("DNM, supra.").]  It places nearly a third of the District's seven active judges in Las Cruces. Moreover, having judges travel there to conduct sentencing in Las Cruces sentences people faster and is more cost efficient than moving those defendants to Albuquerque.

The District also stations five Magistrate Judges in Las Cruces.  [See DNM, supra.]  That means that more than half of the nine Magistrate Judges in the District are located near the border.  While Magistrate Judges can handle some tasks on a felony case, only a District Judge can try a felony case and, perhaps more important in this context, only a District Judge can sentence a convicted felon.  [28 U.S.C. § 636(a).]  The nation also sends visiting judges from other Districts to sit in Las Cruces, and the District Judges from the north frequently go to Las Cruces.

Civil lawyers may often wonder as they wait months for a decision from a District Judge to come out in a civil case, what it is a Federal judge does with his or her time.  It is important to recognize, however, the impact the sheer number of illegal re-entry cases have on the resolution of every other civil and criminal case as well.  Even the northern judges in Albuquerque and Santa Fe, who are not sentencing as many re-entry cases as the judges in Las Cruces,[1] are sentencing many difficult re-entry cases.  [28 U.S.C. § 636(a).]  Some of these more difficult sentences are because the defendants have complex and complicated criminal histories, so the defendant is not looking at time-served sentences, but long, contested sentences.  Even when the court is not sentencing in a re-entry case, the volume of re-entry cases makes it difficult to get to other criminal cases, such as those arising in Albuquerque's metropolitan area and on the 22 Native American reservations and pueblos in the District.  New Mexico is not a sleepy backwater place when it comes to federal crime.  It has the fourth highest number of criminal filings per Federal Judge out of the 94 Federal Districts in the nation.  [See U.S. District Courts-Weighted and Unweighted Filings per Authorized Judgeship During the 12-Month Period Ending September 30, 2012, U.S. Courts, http://www.uscourts.gov/uscourts/Statistics/JudicialBusiness/2012/appendices/X01ASe p12.pdf (last visited Aug. 23, 2013).]  New Mexico's 179.5-mile-long border with Mexico, [Janice Cheryl Beaver, Cong. Research Serv., U.S. International Borders:

Brief Facts 2 (2006), http://www.fas.org/sgp/crs/misc/RS21729.pdf (last visited Aug. 31, 2013),] and three Native American reservations and 19 pueblos, [see Pueblos and Reservations, Albuquerque Convention & Visitors Bureau, http://www.itsatrip.org/albuquerque/culture-heritage/native-american/pueblos-reservations.aspx (last visited Aug. 31, 2013),] provide for a robust federal docket.

James O. Browning & Jason P. Kerkmans, <u>A Border Trial Judge Looks at Immigration: Heeding the Call to Do Principled Justice to the Alien Without Getting Bogged Down in Partisan Politics: Why the U.S. Immigration Laws Are Not Broken (but Could Use Some Repairs</u>, 25 U. Fla. J.L. & Pub. Pol'y 223, 258-60 (2014).

Hence, there is still really no "nationwide" fast-track program; if a U.S. Attorney wants a fast-track plea, he or she can no longer tailor or customize one, and must take the off-the-shelf one that main DOJ has devised, but no U.S. Attorney has to have one. Thus, there is built-in disparity from the fast-track program. Defendants in some districts do not get the benefit of a fast track, while defendants coming into New Mexico do. As many judges correctly note, New Mexico defendants are known to get lighter sentences than elsewhere in the nation. Judges' sentencing policies vary in the district. Hence, it is very difficult in the nation, or even in the district, to avoid sentencing disparities among similarly situated defendants who have been found guilty of such re-entry crimes.

Here, the Court gave Luevano-Sanchez a Guidelines sentence. Luevano-Sanchez chose what district to enter, and illegal aliens are often knowledgeable about which districts have which sentencing policies. Assignments in the district are random, and the sentencing practices vary. Judges talk to each other and to others, and New Mexico judges know that their re-entry sentences are often lower than the rest of the nation and some are troubled by the low sentences that the fast-track program creates for repeat offenders. In any case, while there may be a bit of

randomness in the assignment of a case, Luevano-Sanchez' sentence is neither random nor arbitrary, but the considered application of § 3553(a)'s sentencing goals.

As this Memorandum Opinion and the two sentencing hearings reflect, the Court has carefully considered the Guidelines, but in arriving at its sentence, the Court has taken account, not only of the Guidelines, but of all § 3553(a)'s sentencing goals. Specifically, the Court has considered the Guidelines' sentencing range established for the applicable category of offense committed by the applicable category of defendant. After carefully considering Luevano-Sanchez' request for a sentence within the range of 12 months and 1 day to 18 months, or ultimately a sentence at or below the low-end of the Guidelines range of 18 to 24 months, the Court concludes that the proposed below-Guidelines sentences are not appropriate and that the punishment set forth in the Guidelines is most appropriate. The Court has also considered the kinds of sentences and range that the Guidelines establish. After careful consideration of all the § 3553(a) factors, and the case's circumstances, and the defendant's history and characteristics, the Court concludes that a sentence of 24 months is necessary to reflect the offense's seriousness, promote respect for the law, provide just punishment, afford adequate deterrence -- both at a specific and general level -- protect the public, avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and, because Luevano-Sanchez will be deported as soon as he completes his incarceration, and because the Court does not think that "unsupervised" supervised release is appropriate here. The Court concludes that promoting respect for the law, providing just punishment, and deterrence are particularly important factors in Luevano-Sanchez' case given the number of times he has tried to come to the United States and has come. The Court concludes that this 24-month sentence reflects fully each relevant factor established in 18 U.S.C. § 3553(a). The Court has worked hard

to craft a reasonable sentence, one that accurately reflects the § 3553(a) factors.  See United States v. Smart, 518 F.3d 800, 803-04 (10th Cir. 2008)("Section 3553(a) mandates consideration of its enumerated factors, and implicitly forbids consideration of factors outside its scope."). Finally, the Court concludes that the sentence is sufficient, but not greater than necessary, to comply with the purposes of punishment set forth in the Sentencing Reform Act.

**IT IS ORDERED** that: (i) the requests in Mr. Luevano-Sanchez' Sentencing Memorandum, filed December 2, 2016 (Doc. 34), are denied; and (ii) Defendant Braulio Javier Luevano-Sanchez is sentenced to 24 months imprisonment.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
   United States Attorney
David M. Walsh
Norman Cairns
   Assistant United States Attorneys
Albuquerque, New Mexico

   *Attorneys for the United States*

Michael A. Keefe
   Federal Public Defender
Albuquerque, New Mexico

   *Attorney for the Defendant*

- 51 -